*JOHN T. NEWTON ET AL. V. TOLEDO (CITY) ET AL.

1. AWARDING OF CONTRACTS WITHOUT HAVING ADVERTISED FOR BIDS.
    Where the Board of Natural Gas Trustees of the city of Toledo enter into
    contracts with a certain pipe company to furnish a certain amount of gas pipe,
    the trustees understanding that said pipe was already manufactured and
    therefore deemed it materials, as distinguished from work and labor, and there-
    fore such pipe was purchased without advertising for bids to furnish the
    same: ·*Held*, that a contract "for furnishing pipe," is comprehended by a
    reasonable construction of the language used in secs. 2419 and 2420, Rev.
    Stat., and such contract being made without having first advertised for bids,
    as provided for in the above mentioned sections, is not valid or binding on
    the city. .

2. ISSUE OF BONDS UNDER SEC. 2701, REV. STAT.
    The mere existence of claims against a city for which in some manner it may
    be made, or is liable, is not a sufficient basis for the lawful issue of bonds
    under the provisions of sec. 2701, Rev. Stat., as it now stands; but such
    indebtedness must be such as the city has power to levy a tax to pay, and must
    be already evidenced by bonds of the corporation, or must be such that, on
    account of it, the city had power to issue its bonds when such indebtedness
    was contracted.

BENTLEY, J.

The plaintiffs in this action are taxpayers of the city of Toledo,
most of them residents in the city, but certain of them non-resident.
Having in writing requested the city solicitor to bring this action, and
on his refusal, they institute this suit, under the authority of sec. 1778,
Rev. Stat., on behalf of the city and against the city, its mayor, auditor,
and clerk, to restrain the issuing and sale and application of the pro-
ceeds of certain bonds of the city to the amount of $120,000, provided
for in a certain ordinance of the city, passed February 1, 1892, and
approved by the mayor February 5, 1892.

There is no dispute over the material facts involved in the case, and
so far as they give rise to the questions of law which are necessary to
be considered in determining the controversy, they may be summarized
as follows :

The city of Toledo is a city of the third grade of the first class.

Under the authority of the act of the General Assembly, passed
January 22, 1889, (86 O. L., 7) the constitutionality of which was upheld
by the Supreme Court in the case of State ex rel. Attorney General v.
Toledo, 25 L. B., 218, the city issued and sold its bonds to the amount
of $750,000, and a board of natural gas trustees was appointed as pro-
vided in that act.

With the proceeds of . these bonds the gas trustees purchased or
leased gas territory, and purchased and drilled gas wells (for the most
part about thirty-eight miles from the city), provided iron pipe and
appliances, and constructed a gas main or pipe line, conducting a large
amount of natural gas from the wells to the city, and into a high pres-

---

*The judgment in this case was affirmed by the Supreme Court, without
report, 52 O. S., 649. ·

sure belt line, so-called, connected therewith, around a large area of the city, and certain connections furnishing gas to a few manufacturing establishments which could use gas from a high pressure pipe, and also a comparatively short line of low pressure for service pipe on one street of the city, from which about a half-hundred private consumers were supplied with natural gas.

This much had been done up to May or June, 1891, and the cost of the work and the expenses and compensation of the trustees exhausted the entire proceeds of said $750,000 of bonds.

At this stage the gas did and would produce but little revenue.

It was impracticable and would be attended with more or less risk of danger to supply private or domestic consumers of gas, by tapping said high pressure mains with service pipes leading directly to the houses or dwellings, and the proper method of supplying such consumers was by means of low pressure mains and branch pipes laid in the various streets and alleys of the city, into which gas should be let at certain points from said high pressure lines, through connecting pipes, fitted with regulators, reducers and appliances by which the pressure of the gas should be kept at a low and comparatively uniform degree, and which low pressure pipes could be tapped for service pipes leading into buildings and dwellings for use.

At various times between July 1, 1891, and December 15, 1891, the natural gas trustees procured gas pipe, and caused many miles of these low pressure gas mains and connections to be constructed in various streets and alleys of the city where consumers could most frequently be had, and so that an area of the city containing about half of the whole number of citizens who would be likely to wish to purchase gas from said trustees could be supplied from said pipes, so far as the gas supply would admit.

In procuring said low pressure pipe, and constructing said low pressure lines, and between July 1 and December 15, 1892, said trustees incurred the indebtedness in controversy, and to fund and extend the payment of part of which, the city proposes to issue the said $120,000 of bonds.

. There are four kinds or classes of these alleged debts, and they aggregate something more than $344,000.

The claims of the first class arose as follows:  Commencing sometime in July, 1891, the board of natural gas trustees entered into contract in the name of the city with various contractors to furnish labor and material for constructing certain of said low pressure pipe lines. By the terms of said contracts said contractors respectively were to receive for said labor and materials seventy-five per cent. of the proceeds to be received by said gas trustees from the sale of gas furnished through the lines laid under said contracts respectively, said payments to be made monthly until the full contract price for said labor and material, with six per cent. interest thereon from thirty days after the final estimate, should be paid.  Said contracts further provided that in case said seventy-five per cent. of income did not fully pay the contract price and interest within one year from the final estimate, "then the amount remaining unpaid shall be paid monthly out of the available general income of the natural gas plant," and "in case such available general income shall not be sufficient to pay such contract price with interest at six per cent., payable annually, within three years from the date of such

final estimates, then the balance remaining unpaid shall become at once due and payable upon the expiration of said three years."

Under these contracts various streets were piped, and final estimate made, and gas was furnished through them to consumers, but the entire receipts were used by said trustees in procuring additional gas territory and wells, and the said seventy-five per cent. has not been paid to the contractors, and the amount owing to them aggregates $174,000.

The claims of the second class in controversy are held by the American Tube and Iron Co. and the Chester Pipe and Tube Co. for furnishing iron pipe for certain of said low pressure lines, under certain four contracts made by them respectively with said trustees therefor, each thereof amounting to more than $10,000, by the terms of which contracts the said pipe was to be delivered in the city of Toledo in installments as called for by said trustees, and the trustees agreed to pay therefor at from six to nine months from the date of delivery, and on the delivery thereof the gas trustees issued and delivered to said companies respectively certificates covering their several amounts, and falling due as aforesaid. These have not been paid, and aggregate more than $86,000. The pipe thus supplied was used for said intended purpose, and gas has been and is being delivered through it to consumers.

No advertisement for bids for the furnishing of said pipe was published, but the agreements were entered into by correspondence, after getting offers of quotations of prices from various manufacturers and dealers, the trustees understanding that said pipe was already manufactured, deemed it material as distinguished from work or labor, and that therefore no advertising for bids was required by sec. 2419, Rev. Stat., or by other laws.

The third class of claims are described properly in the petition as follows: "During the summer and fall of 1891 certain citizens of the city of Toledo advanced and paid to said natural gas trustees a large amount of money to be used in laying pipe in certain streets in the city of Toledo for the purpose of furnishing gas to the citizens so advancing said money, and that said money was so advanced and paid by said citizens to said natural gas trustees under the understanding and agreement that the same should be repaid to them by crediting to them fifty per cent. of their monthly gas bills, and not otherwise."

The trustees laid many of the pipes in question, but not all for which said money was thus advanced, and on the gas bills of certain of said citizens for gas delivered through said pipes, credited said fifty per cent. and in that way have reimbursed said citizens for said money advanced to an amount aggregating several thousand dollars, leaving about $51,000 of money thus advanced by citizens for which no reimbursement has been made.

The fourth claim is made up of claims for other labor and materials furnished at the request of said gas trustees by various persons, in and about constructing low pressure gas pipe lines within said city, through which gas is furnished to consumers which claims aggregate about $33,000.

At the time of entering into the several engagements or contracts giving rise to these four classes of claims, said proceeds of said $750,000 of bonds had been otherwise actually expended or appropriated, and there was no other fund appropriated or provided for the purpose for which said contracts or any of them were made, or applicable to the

payment of any of said contracts, except the expected future income from the sale of natural gas by said trustees.

Among other stipulations between the parties upon the trial these two were entered into—8 and 9—which I will read:

"8. It is admitted that at the time of the entering into the contracts by the natural gas trustees set out in plaintiff's petition, the city had no fund, and never since has had any fund, with which to pay said alleged indebtedness, or any part of it, and that the entire income of the city from taxes or otherwise is appropriated for a year to come, with the exception of the income that the trustees may derive from the natural gas plant.

"9. It is admitted that no levy has been made for the purpose of paying this claimed indebtedness in controversy or any part thereof."

And we find the fact to be, which is admitted, that no certificate of the city auditor, such as is mentioned in sec. 2702, Rev. Stat., had been given with reference to any of said contracts or engagements, and there was no application to or action by the common council of the city with reference to any of these proceedings of the gas trustees, until and except the passage of the ordinance in question here, providing for the issue of said bonds of the city. The ordinance is brief, and reads as follows:

"An ordinance to provide for the issue of general fund bonds, for the purpose of extending the time of the payment of certain indebtedness, which from its limits of taxation the city of Toledo is unable to pay at maturity.

"Sec. 1. Be it ordained by the common council of the city of Toledo, that to provide means to refund and extend the time of payment of certain indebtedness, to-wit, that incurred in the piping of streets of the city of Toledo for the purpose of distributing natural gas for heating and illuminating purposes within the corporate limits of said city, in accordance with the provisions of sec. 2491$b$, Rev. Stat. of Ohio, which from its limits of taxation the city of Toledo is unable to pay at maturity, there shall be issued general fund bonds of the city of Toledo to an aggregate amount of $120,000, said bonds to be made payable at the Importers' and Traders' National Bank in the city of New York, with interest at the rate of $4\frac{1}{2}$ per cent. per annum, payable semi-annually at the same place, to be evidenced by coupons attached to said bonds, and said bonds shall be issued in aggregate amounts for the special purpose herein before specified, in denominations of $1,000 each, and said bonds shall be dated March 1, 1892, and shall run for a period of ten years, and bear interest from the date thereof.

"Sec. 2. Said general fund bonds shall be prepared, issued, and delivered under the direction of the committee of ways and means of the common council and city auditor, and shall be signed by the mayor of the city of Toledo, and countersigned by the city auditor, and sealed with the corporate seal of said city; and the interest coupons attached to said bonds shall be executed by the city auditor, with his signature thereto, or have the same printed or lithographed thereon, and said bonds and the interest coupons thereto attached shall be registered by said auditor in a book kept for that purpose."

The petition in this case, after setting out the amount and character of said four classes of claims, and the circumstances and manner in which said contracts were entered into by said trustees, and the adoption by the common council of the said ordinance and its approval by the mayor, proceeds as follows:

Newton et al. v. Toledo (City) et al.

" Plaintiffs further say that the said city of Toledo and its officers and agents propose to issue and sell said first above mentioned bonds for the sole and only purpose of paying off and refunding said above mentioned alleged indebtedness or some part thereof, and the portion of said alleged indebtedness to the payment of which said $120,000 is to be applied, is left wholly undetermined by any ordinance, resolution, or act of the city of Toledo, or otherwise.

" Plaintiffs further say that all said above mentioned contracts and alleged indebtednesses were and are illegal and void, for the reason herein before stated, and that none of said alleged indebtedness is a valid debt against the city of Toledo.

" Plaintiffs further say that the issue and sale of said bonds would be an abuse of the corporate powers of the city of Toledo, and would be the execution of a contract in contravention of the laws governing the same; and the expenditure of the funds arising from the sale of said bonds in the manner proposed as above stated, would be a misapplication of the funds of said city, and would work upon the taxpayers of said city, and said city, great, lasting, and irreparable injury."

Wherefore they pray that the city and its officers be restrained from issuing or selling the bonds, or paying the indebtedness out of the proceeds thereof.

It will be seen that this court is not called upon to determine whether or not there is or may be any kind of liability in any amount finally attaching to the city growing out of the facts and circumstances herein suggested, and which might in actions by the holders of any of said claims, or others, be enforced by appropriate proceedings, but the question addressed to us is whether among these classes of claims are embraced contracts which are comprehended within the terms of the ordinance, which, as such, entail valid obligations against the city to an amount at least equal to the sum of said proposed bonds. Counsel for the defendants argue, and, we think, correctly, that if there be such contracts for which bonds might be rightfully issued, to the amount proposed, and which are covered by the terms of the ordinance, we should presume that the council in its further action in distributing the avails of the bonds will apply them to the valid obligations, though the general terms of the ordinance might seem also to include claims of a different character. Applying this idea, we suppose it is of no practical importance in the disposition of this case how we should determine the special objection that is made to said contracts with the American Tube and Iron Company, and the Chester Pipe and Tube Company, on account of the failure of said trustees to advertise for bids, since if these claims be included in the terms of the ordinance, and if they would be valid obligations against the city, had no grounds for this special objection existed, the first class of claims would be no less included in the ordinance and equally valid, and this first class, amounting to far more than $120,000, would, upon the presumption above alluded to, constitute a sufficient basis for a decree.

But as this special objection has been argued at length, and concerns the large sum of $86,000, which might be regarded as properly entering into the requisite amount of $120,000, we have considered this special objection that contracts were entered into for procuring pipe involving more than $10,000, each without any advertisement calling for bids for supplying it.

By the act of February 27, 1889, certain enumerated provisions of the chapter of the Revised Statutes relating to waterworks was made to govern this city, its officers and agents, in constructing and operating natural gas works. These provisions include those relating to the authority to make contracts; and in this respect secs. 2419 and 2420, Rev. Stat., are applicable.

Section 2419, Rev. Stat., reads as follows:

"The trustees or board, before entering into any contract for work to be done, the estimated cost of which exceeds five hundred dollars, shall cause at least two weeks' notice to be given, in one or more daily newspapers of general circulation in the corporation, that proposals will be received by the trustees, for the performing of the work specified in such notice; and the trustees shall contract with the lowest bidder, if in their opinion he can be depended on to do the work with ability, promptness and fidelity; and if such be not the case, the trustees may award the contract to the next lowest bidder, or decline to contract and advertise again."

Section 2420, Rev. Stat., reads as follows:

"The trustees or board shall require bond to be given, with good and sufficient security, for the faithful performance of the work; but no member of the board of trustees, or public works, shall be such security; nor shall any trustee, or member of the board of public works, be a contractor, or in any wise, either directly or indirectly, interested in any such work to be contracted for; provided, that in case of emergency, council may, by a vote of two-thirds of all the members elected, authorize the trustees or board to enter into such contracts without advertising."

The counsel for defendants urge that the trustees' contract with those companies to furnish so much iron gas pipe for a net price on board the cars here in Toledo might be and probably was filled by said companies out of a stock on hand at the time the contract was made, and hence was a purchase of materials, and was not "for work to be done," and that therefore no advertising for bids was necessary. It is, perhaps, proper to say that the good faith of the trustees is not impugned, and no question is made that the price agreed upon is unreasonable, or not the lowest offered. Indeed, it was shown that there were other offers received, and while some of them were lower for small quantities of pipe, those accepted were the lowest for the large amounts required.

It would seem singular that the legislature would so carefully guard against exhorbitant charges for any labor to be done, estimated to cost over $500, by requiring opportunities for competitive bidding, and purposely neglect to provide any check upon prices for the products of labor already done, the owners of which are generally credited, as the world goes, with fully as much adroitness, ability, and cleverness, not to say ingenuity, in the disposition of their wares to advantage, as is accorded to those who have future labor to sell, and in almost every instance the cost of material compared with that of labor is large. And finding this provision as to labor, we should expect to find it as to materials also. Certain it is, as argued by defendants' counsel, that in many places in the different statutes of the state a distinction is recognized between labor and materials. The general section 794, among others, recognizes this, and provides that municipal authorities in making any improvement costing $10,000 or more, when required to advertise for bids, shall call for separate proposals for different kinds of labor and different kinds of materials, in order that by selecting the lowest bid for each class the combined cost of all labor

and all material shall be the lowest reasonably attainable, but there is no suggestion that these sanctions for the public good shall be applied less to material than to labor. This section is not alluded to as necessarily settling the question now agitated, but by way of illustration, since its terms are made to apply whenever the law requires advertising " for proposals for furnishing the materials and doing the work necessary."

The board of trustees of waterworks are, by sec. 2415, Rev. Stat., which now applies to the gas trustees so far as applicable, authorized to make contracts for the *building* of machinery, waterworks, buildings, reservoirs, and the enlarging and repair thereof, and the *manufacture* and laying down of pipe, etc. Can it be possible that the trustees could separate the comparatively small actual labor charge involved in accomplishing these ends from the cost of materials, running, perchance, and frequently in fact, into hundreds of thousands of dollars, and so avoid all requirement for competitive bidding for the latter? Either they or the gas trustees are unauthorized to procure pipe except by contracting for its " manufacture " (which would seem a narrow view to take), or they must procure it under similar forms made expressly requisite in contracting for its manufacture. A " work " often includes the idea of both work and labor entering into it. " Before entering into any contracts for work to be done "—put in the word " a " before " work," and the meaning, perhaps, would be made plainer: "before entering into any contract for *a* work to be done."

It is only in cases of *emergency*, and then only by a vote of the council, and with the concurrence of two-thirds of all the members elected, that advertising for bids may be dispensed with, according to sec. 2420, Rev. Stat., which I have read.

We feel clearly warranted in holding as we do, that a contract "for furnishing pipe," which is the contract here in question, is comprehended by a reasonable construction of the language used in secs. 2419 and 2420, Rev. Stat., and that neither of said contracts with said companies is valid or binding as such, on the city.

This, however, as we have said, does not dispose of the main question, or throw any special light upon it.

It is claimed that these provisions of sec. 2701, Rev. Stat., directly authorize the issue of these bonds. That section reads as follows:

"The trustees or council of any municipal corporation, for the purpose of extending the time of the payment of any indebtedness, which, from its limits of taxation, such corporation is unable to pay at maturity, or when it appears to the said trustees or council for the best interest of the said municipal corporation, shall have power to issue bonds of such corporation or borrow money so as to change, but not increase the indebtedness, in such amounts and for such length of time, and at such rate of interest as the council may deem proper, not to exceed the rate of six percentum per annum, * * *."

It is argued by council for the plaintiffs that the mere existence of claims against the city for which in some manner it may be made or is liable, is not sufficient basis for the lawful issue of bonds under this section, but that the indebtedness must be such as the city has power to levy a tax to pay, and must be already evidenced by bonds of the corporation, or must be such that, on account of it, the city had power to issue its bonds when the debts were contracted.

We assume that the contracts in question must, to the extent of $120,000, be valid obligations of the city, in their present form, to war-

rant the issue of these bonds, and this assumption forces upon us the inquiry whether that much of this alleged indebtedness, is in this sense, valid as against the city. The answer to this must largely depend upon the construction to be given to the original act of January 22, 1889, (86 O. L., 7,) the act of February 27, 1889, (sec. 2491a, 86 O. L., 58,) and that of April 1, 1891 (sec. 2491b, 88 O. L., 258).

We must of course interpret these statutes in the light of constitutional provisions regarding the duty of the legislature as to providing limitations upon the power of municipalities to levy taxes, contract debts, and the general policy and legislative understanding apparent in legislation in this regard. And the powers of the city council and board of natural gas trustees are to be viewed with reference to the general principles acknowledged by all; that municipalities and their agents have only such powers as are expressly conferred, or such as are necessarily and reasonably implied, from those expressly granted as necessarily involved in the exercise of those powers in accomplishing the object intended.

The act of January 22, 1889, is entitled, "An act to authorize cities of the third grade of the first class to borrow money and issue bonds therefor, for the purpose of procuring territory and right of way, sinking wells for natural gas, purchasing wells and natural gas works, purchasing and laying pipes, and supplying such cities with natural gas for public and private use and consumption."

The first section provides that—

"Any city of the third grade of the first class in the state of Ohio shall be, and is hereby authorized to issue its bonds for an amount not exceeding $750,000, for the purpose of procuring territory, right of way, sinking wells for natural gas, purchasing wells and natural gas works, purchasing and laying pipes, with all necessary fixtures, attachments, machinery, and for constructing the necessary buildings to supply such city and the citizens thereof with natural gas for public and private use and consumption."

The second section reads:

"Before such bonds, or any of them, shall be issued by any such city, the question of issuing the same shall be submitted to a vote of the qualified electors of such city, at any general or municipal election to be held therein; and at such election separate ballots shall be provided and used by the voters upon said question. The tickets voted shall have written or printed thereon the words "Authority to issue natural gas bonds—Yes;" or "Authority to issue natural gas bonds—No." If the proposition to issue bonds be approved by sixty per cent. of those voting upon the proposition, such city shall have authority to issue such bonds for the purposes named, as provided in this act."

The third section provides for the notice and conduct of the election.

The fourth section provides for the form and terms of the bonds, and that they shall be sold for not less than par.

The fifth section reads:

"No more of said bonds in any case shall be issued or sold than is necessary for, and required by the actual and necessary cost and expense of procuring the necessary grounds, sinking such number of wells as may be required for the purposes named, the purchase of wells and natural gas works, purchasing and laying of pipes, and the right of way therefor, and such other necessary attachments, fixtures, machinery and structures, as may be requisite to carry into effect the provisions of this act. And

such bonds shall be sold from time to time as the works progress, and in such amounts as shall be required for the proper progress and final completion of such work.   All proceeds and moneys arising from such bonds shall be used exclusively for, and applied to, the payment of the work, labor, material and other expenses necessary for the supply of gas for the purposes aforesaid.   But not more than $75,000 of said bonds shall be issued or sold for the purpose of paying the cost and expense of procuring the necessary gas territory, and sinking and purchasing such number of wells as may be required for the purposes named; provided, that the common council of any such city may, by ordinance, authorize the trustees of gas works to increase said cost and expense to a total amount not in excess of $150,000, and may authorize the further issue and sale of said bonds for such purpose to the extent of an additional $75,000."

The sixth section is as follows:

"All moneys collected or received by the trustees of gas works of such cities, respectively, from the consumers of such gas, after paying the necessary running expenses thereof, shall be applied to the payment of such bonds and interest.   And the council of such municipality is hereby authorized to levy a tax annually, not exceeding $1\frac{1}{2}$ mills on the dollar valuation, on the taxable property within any city, affected by this act, in addition to the tax now by law authorized to be levied therein, in such amount as will in each year be sufficient with the net income of such gas works, to pay the principal and interest then falling due upon such bonds, and provide a sinking fund for the gradual redemption of such bonds."

The seventh section reads as follows:

"All moneys so applicable to the payment of such bonds, which shall come into the hands of the trustees of gas works, before such bonds or any of them become due, shall be used to purchase such bonds or invested under the order of the sinking fund trustees of such city, and the bonds so purchased, or the evidences of the investments so made shall be delivered by said gas works trustees as soon as the transaction is completed, to the sinking fund trustees of such city, who shall place the same to the credit of said bonded debt, and use the same as required for the extinguishment of the debt created under this act, and for no other purpose."

Section 8 provides for the appointment by the governor of five natural gas trustees, and says, "and the board so appointed shall have charge of the purchase, construction and management of the gas works provided for by this act.

It is urged for the defense that the main purpose of this legislation was to provide for the construction of a complete and efficient natural gas plant for this city, and the provisions regarding the bonds were merely incidental to the main object; and the case of Cincinnati v. Cameron, 33 O. S., 336, is cited as sustaining this view.   We regret that we have had to proceed in this investigation without much light from that case.   That action was originally brought by Cameron to recover from the city of Cincinnati for labor and materials furnished by him in the erection of the Cincinnati Hospital, under a contract, as he claimed, with the authorized agents, of the city therefor.   His original contract was in writing, and did not include these items, and provided that no additional work, or modification, or alteration of the work mentioned in the plans and specifications should be done or paid for, unless ordered in writing by the board, and these items were furnished by the oral direc-

tions of the board without writing, and the city defended on that account, and that the other expenditures in the erection of the building has exhausted the $750,000 provided for the work.

There were some questions of practice in the case, and the court held that the municipal authorities might and did waive the provisions of the original contract that alterations and extras should be done only upon written order, the fourth paragraph of the syllabus being a statement of all that might really bear on the case at bar. This paragraph reads as follows:

"A contractor does work for a municipal corporation, which refuses payment on the ground that the fund provided by legislative authority has been already expended. If this be the only defense, the corporation must clearly show that at the time of making the contract and entering upon its execution, it, with others, exceeded in amount the fund provided; otherwise this defense cannot prevail. If, at the time of making the contract and entering upon its execution, it, with others, did not exceed in amount the fund provided; but the municipal authorities subsequently made other contracts, the aggregate of which, together with those already existing, was in excess of the fund, the contracts first made, and which were within the limit, are not invalidated, and that the fund is exhausted, is not a ground of defense."

The expenditures in the present case were made after the $750,000 appropriated by the act of January 22, 1889, were exhausted.

The act of April 6, 1866 (S. & S., 884), under which the Cincinnati Hospital was erected, was entitled, "An act to provide for the erection of a hospital in cities of the first class, having a population of over one hundred thousand inhabitants." The act here in question is denominated "An act to authorize cities of the third grade of the first class *to borrow money and issue bonds therefor*," etc. The Cincinnati Hospital act of 1866 provided for submitting to a vote of the people "The question whether they shall build a hospital."

In this natural gas act there was to be submitted to the vote of the electors only the question of the issuing of said bonds. The provisions of sec. 16, art. 26, of the constitution, regarding the subject of a law being clearly expressed in its title, while directory only, yet, as said in Miller v. The State, 3 O. S., 475, and in other cases, "its purpose was to provide a permanent rule of the houses," and we are to presume that the legislature has followed the behests of the constitution, even though merely directory, and that the purpose of the bill is clearly expressed in the title. Bronson v. Oberlin, 41 O. S., 476. And there was this additional difference in the situation of the board here and the board there. Provision existed for a fund applicable to hospital erection to be raised by taxation, independent of the provision of that particular act; here, no such provision exists. We must therefore look for guidance to other authorities and considerations.

Doubtless the legislature in passing the act of January 22, 1889, contemplated the construction of a complete and efficient gas plant, but it is equally clear that it contemplated the entire cost thereof to be met by the proceeds of the bonds authorized. By said sec. 5 no more of said bonds are to be issued or sold than necessary for the purposes named— "*final completion* of such work"—as if these objects might be secured at even less expense than $750,000, and the amount to be expended for the supply of gas, the very *sine qua non* of the entire enterprise, is limited at first to $75,000, and then the council is authorized to extend that

Newton et al. v. Toledo (City) et al.

expenditure to $150,000. The latter sum is made by sec. 5, the limit of *the total cost and expense* for procuring a supply of gas. And it will be seen that secs. 6 and 7 provide that all of the income of the plant over running expenses, be devoted to the payment of the principal and interest of those original bonds, till they are paid off, and the only tax authorized by the act is strictly limited in its objects and application to the payment of the same bonds. All this plainly indicates at least, that the legislature, at the time of the passage of the original act, did not contemplate the construction of a work to pay the costs of which other funds than the proceeds of those bonds might be resorted to under existing laws, and without further application to the General Assembly, there being no express authorization to the trustees or council to construct the work, except as a manner of expending the fund provided. To submit to the people the question as to whether bonds should be issued for $750,000, and then to intend to grant on the basis of a favorable vote on that question, full authority to enter into contracts to an amount absolutely unlimited except by the judgment of the trustees and their opinions as to what should constitute a complete and efficient natural gas plant, such as Toledo ought to have, would seem to be a playing with the rights of the people, as undignified for a legislature as it would be unjust and contrary to the spirit of the constitution as to the limits of municipal expenditure and the generally careful policy of preceding legislation in this respect. Had the legislature clearly authorized the contracting of indebtedness without regard to the fund especially provided, perhaps the limits as to the objects to be attained, though somewhat vague and elastic, might have been regarded as a sufficient compliance with the directions of art. 13, sec. 6, of the constitution. And with the legislative interpretation the courts would not have the power to interfere. But we are not here questioning the power of the legislature to pass such enactments as it has, but rather to ascertain what it has enacted. And we think that the original act authorized no contract involving with others an amount of expenditure in excess of the proceeds of the three-quarters of a million dollars of the original bonds.

The act passed about a month later, and at the same session, made the provisions of chapter 1, division 8, title 12 (the waterworks chapter) to govern, so far as the provisions of such statute are applicable, the municipality, its affairs and agents, as to said enumerated matters, and among the things thus enumerated is, "their authority to make contracts."

This was the first statutory provision that gave the gas trustees any power greater than the mere superintendency of the construction and operation of the works. It does not name the board of gas trustees, nor say expressly that it shall correspond to the board of waterworks trustees, and have similar powers and duties, since the provision is general that as to those matters that chapter shall, so far as applicable "govern such municipality, their officers and agents." Perhaps it would be fairly implied that the board of gas trustees should, as respects these matters, stand in the place of the waterworks trustees as to the water work plant, and have *mutatis mulandis*, its powers to contract so far as the authority thus defined would not conflict with the provisions of general law and the clear and express provisions of the original gas act. And the inquiry is, what are the general limitations upon the power of the gas trustees to enter into contracts? The basic provision as to munici-

pal contracts generally is found in sec. 17 of the Revised Statutes, and sec. 2702, Rev. Stat., follows with an additional guard.

"Section 17.  An officer or agent of the state or of any county, township or municipal corporation, who is charged or entrusted with the construction, improvement, or keeping in repair of any building or work of any kind, or with the management or providing for any public institution, shall not make any contract binding or purporting to bind the state, or such county, township, or municipal corporation, to pay any sum of money not previously appropriated for the purpose for which such contract is made, and remaining unexpended and applicable to such purpose unless such officer or agent has been authorized to make such contract; and if any such officer or agent make or participate in making contracts without such appropriation—

It proceeds that the municipality shall not be bound thereby.

Now sec. 2702, Rev. Stat., is familiar, but to have it fresh in mind at this point, I will read it:

"No contract, agreement, or other obligation involving the expenditure of money, shall be entered into, nor shall any ordinance, resolution or order for the appropriation or expenditure of money, be passed by the council or by any board or officer of a municipal corporation, unless the auditor of the corporation, and if there is no auditor, the clerk thereof, shall first certify that the money required for the contract, agreement, or other obligation, or to pay the appropriation, or the expenditure, is in the treasury to the credit of the fund from which it is to be drawn, and not appropriated for any other purpose, which certificate shall be filed." etc.

There are quite a number of other provisions, but this is sufficient to illustrate the provisions that we are here considering.

The original act corresponding to said sec. 17 is found in S. & C., 889, where the contract without a fund applicable to its payment was prohibited unless "lawfully or expressly authorized."  In sec. 17 the words "lawfully or expressly" have been dropped, but the provision is mere circumlocutory nonsense, unless we interpret it to mean, as it clearly does, that no contract not based on a fund applicable to its payment shall be valid, unless by express language or by necessary implication, the corporation or its officers are authorized to disregard that limitation; otherwise that provision stands in perpetual guard over municipal treasuries and the rights of the taxpayer.  There must be a fund previously appropriated, unexpended, and applicable to the purpose of the contract.  What might fairly be deemed an appropriation of a fund for the purposes of a contract may be a question easier of debate than of solution.  The waterworks trustees have two sources of revenue, at least. A tax for waterworks is expressly authorized by secs. 2429, 2430, 2412, and the 17th paragraph of sec. 2632, and the income from water rent comes into their control. By sec. 2412, the trustees may use the rents for current expenses and to extend the works.

It is certain that although sec. 2415, expressly authorized the waterworks trustees to make contracts, that must be taken with the limitations prescribed in secs. 17 and 2702.  The waterworks board must not enter into a contract without a fund applicable for the purpose, provided for by tax, assessment, or otherwise, nor until a certificate is furnished that the money required is in the treasury.  And it is equally clear that sec. 2491a, giving, as may be conceded, to the gas trustees the powers of the

Newton et al. v. Toledo (City) et al.

waterworks trustees, gives them with all the limitations attaching to them.

We have been assiduous in searching for some provision which would create a fund applicable to the contracts of the gas trustees for any further construction or extension of the gas plant when the proceeds of the original bonds were exhausted. There is no tax provided for. the purpose. The tax mentioned in secs. 6 and 7 of the original act cannot be diverted therefor, that being expressly prohibited by the act itself, and the constitution, art. 15, sec. 5. The act also provides for the application for other purposes, of all the income of the plant. The parties agree, and the fact is, that none of said original fund was applicable, and that when the contracts were entered into "The city had no fund and never has had any fund with which to pay said alleged indebtedness or any part of it, and that the entire income of the city from taxes or otherwise, is appropriated for the year to come, with the exception of the income that the trustees may derive from the natural gas plant." Under these circumstances, the conclusion is inevitable that said gas trustees had no power or authority to bind the city by the engagements in controversy, unless such a construction can be put on said sec. 2491*b* as will remove the objections we have considered, and take the case out from the limitations and prohibitions to which we have already alluded.

That section reads as follows:

"That in cities of the third grade of the first class, the council shall, upon recommendation of the board of natural gas trustees, provide for assessing the cost and expense of laying or extending pipes with the necessary fittings for the distribution of natural gas for heating and illuminating purposes upon the lots and lands bounding and abutting upon the streets, alleys, lands, highways, market spaces, public landings and commons, in or along which said gas pipe may be laid or extended, by the foot front, or according to the valuation on the tax list, or according to the benefits, as they shall determine in each instances. Provided, however, that such assessments shall not exceed the sum of fifty cents (50) per front foot on each side of any such street, alley, lands, highways, market spaces, public landings, or commons. One-half ($\frac{1}{2}$) of said assessment shall be payable within ten (10) days from date of confirmation thereof, and the remainder within one year thereafter. A certified copy of said assessment shall be at once furnished by the city clerk to the board of natural gas trustees. Provided, further, that the owner of such assessment or assessments may collect the same in the same manner in which other assessments are collected, and any person who pays said assessment, or any part thereof, shall be entitled to receive a voucher therefor upon a form to be approved by the natural gas trustees of said city. Such voucher shall be received by the board of natural gas trustees at all times in payment at regular rates for gas furnished from the pipe or pipes for which such assessment was levied. Provided that when the board of natural gas trustees shall determine to lay or extend any pipe or pipes with necessary fittings for the purpose of distributing natural gas for heating or illuminating purposes within the corporate limits of such city, or to have same laid and constructed, the provisions of sec. 2702, Rev. Stat., shall not apply to any contract which said board may enter into for such purpose or purposes.

We can see that there might be force in the argument that the fund therein provided for, that is, the avails of assessments, might be such as

to constitute the appropriated fund required by said sec. 17, Rev. Stat., and the proviso that, as to that, sec. 2702 should not apply would obviate the difficulties suggested; but unfortunately for the defendants, there were no assessments made under the authority of that section, and no application or recommendation to the council therefor, but the proof is uncontradicted that proceedings under the act of April 1, 1891, (sec-2491*b* were found or deemed to be impracticable.

Were we to hold according to the contention of defendant's counsel that that proviso constitutes a general act applicable as well to contracts which the gas trustees might make other than those entered into under the provisions of that section, as to those based on proceedings under it, it would be difficult to conclude that the more general sec. 17 was also suspended, since, not only would there be no money in the treasury applicable to the contracts and no certificates thereof, but there would be no fund provided to come in in the future, nor power to create such fund without further application to or action by the legislature. But very earnest and able arguments were made pro and con as to the construction to be given to this proviso, the plaintiffs contending that the proviso is limited in its effect to the proceedings mentioned in the former part of the same section, and only lifts, or suspends, the prohibitions of sec. 2702 from contracts entered into on the basis of the assessments therein provided, leaving sec. 2072 in full operation and force as to all other contracts. We have given this subject much thought and investigation, and are convinced that this view of the effect of the proviso is correct.

It will be noticed that the gas trustees do not make the assessment. They recommend it to the council, and the council thereupon "provides for assessing the cost and expense upon the lots and lands abutting upon the streets and alleys designated by it," and determines whether the assessment shall be by the foot front or according to the valuation for taxation, or according to benefits.

This first act of the council is not the actual making of the assessment, but the preliminary proceedings appropriate therefor. It gives to the trustees some basis for a contract, and precedes the making of the contract by the trustees. Whether it may be regarded as providing such fund as might be deemed as a sufficient compliance with sec. 17, or whether sec. 2491*b* may contain that authority for a contract made under it, which obviates the necessity for the previously appropriated fund otherwise required by said sec. 17, we need not determine. Compliance with the terms of sec. 2491*b* might well be regarded by the legislature as affording the proper protection against the evils against which, as to other contracts, said secs. 17 and 2702 provide a safeguard. And where the legislature has suspended the operation of said sec. 2702 in other cases, as for instance in sec. 2264, it has been under similar circumstances, that is, where other specific provisions would seem to render sec. 2702 unnecessary. To suspend the operation of the provisions of sec. 2702 as to the general contracts of the board of gas trustees, would be of no avail, since the provisions of sec. 17 would still prohibit such contracts as those in question in this case.

These contracts must, then, be held invalid as contracts binding on the city under each of these secs. 17 and 2702, and this view would sustain the plaintiffs' position, and entitle them to the relief prayed for But further than this, the ordinance here in question provides that these $120,000 of bonds be issued "to refund and extend the time of payment of the indebtedness incurred in piping the streets of Toledo  *    *     in

accordance with sec. 2491b, Rev. Stat. of Ohio." The evidence is that none of the disputed indebtedness was incurred in following the provisions of that section, because they were found to be impracticable. Section 2491b contains no grant of power to contract generally. The proviso simply lifts one obstacle preventing contracts in certain cases, and none of the disputed debts can properly be said to have been incurred "in accordance with sec. 2491b."

The position that the plaintiffs are and the city would be estopped from questioning the validity of these contracts is not tenable. The thoughtful will appreciate that it is not the province of this court, nor would it be allowable or seemly for it, to determine the issues of this case by considering the difficulties and embarrassments that may result to citizens of the city in case this action be maintained, nor by dwelling on any impropriety in leaving the gas plant in its present shape, any further than a view of the situation and any supposed prophetic contemplation of the like by the legislature may legitimately bear upon the true construction of statutes. We must apply the laws as we find them, and leave parties interested to better the situation by application to the legislature or to seek other appropriate remedy, in case it finally appear that the constructions we have given are correct.

The decree of the court will be in favor of the plaintiffs, enjoining the defendants as prayed for in the petition, and that the city pay the costs, including an attorney's fee to plaintiff's attorney, in the sum of $———, which is hereby allowed them.

*Guy W. Kinney* and *Barton Smith*, for plaintiffs.

*W. H. A. Read, Thomas H. Tracy* and *E. W. Tollerton*, for defendants.